UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                   Case No. 13-CR-219

LISA A. LEWIS,

        Defendant.

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by its attorneys, James L. Santelle, United States Attorney, and William J. Roach, Assistant United States Attorney, respectfully submits this sentencing memorandum.

## I. BACKGROUND ON CASE.

Lisa Lewis was indicted on multiple counts of wire fraud contrary to 18 U.S.C. § 1343. As will be more fully set forth below, Lewis embezzled money from at least thirteen, elderly investors that in total exceeded $2,000,000. For several victims, this was their life savings. For most, their lives have been in constant turmoil and stress.

Lewis entered a guilty plea to a single count of wire fraud and is set for sentencing on June 11, 2014. The plea agreement calls for the government to recommend a ten-year sentence. It further provides that she agrees to pay restitution totaling $2,021.486.41. Lewis further agrees to both a money judgment in that amount and the forfeiture of property including several residences and a Chevrolet Camaro.

## II. APPLICABLE LAW

As a result of *United States v. Booker*, 543 U.S. 220 (2005), the sentencing guidelines now are effectively advisory. While a sentencing court must still consider the guidelines, it must also consider other factors as well and, in particular, the factors specifically identified in 18 U.S.C. § 3553(a). *Id*.

Under § 3553(a), a court "shall impose a sentence sufficient, but not greater than necessary" to comply with the following purposes of sentencing:

a. To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

b. To afford adequate deterrence to criminal conduct;

c. To protect the public from further crimes of the defendant; and

d. To provide the defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner.

In determining the particular sentence to be imposed, a court also must consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect paragraphs (a) through (d) above; (3) the kinds of sentences available; (4) the types of sentences and sentencing range established by the sentencing guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

### III. ARGUMENT

   a. *Nature and circumstances of case.*

The nature and circumstances of the offense are horrific. In sum, Lewis preyed on elderly investors by befriending them, securing their complete financial trust, and then draining them of

2

their hard-earned money.

Lewis knew many of the victims for years prior to the embezzlements. She knew Mary Jane Kennedy for approximately 17 years (PSR ¶24). She conducted financial transactions for Gloria Shea since 2001. (Shea VIS). Others were introduced to Lewis by other victims. (e.g. Gloria Shea introduced Robert Guerts to Lewis). It is no surprise that in addition to the pain stemming from their own financial loss, those victims introducing friends to Lewis are living with incredible guilt knowing that had they not done so, their friends financial portfolio would still be intact.

Lewis obtained the victim's complete financial trust through friendship, lies, and false bank statements. Lewis portrayed herself to the victims as their friend. And she was good at it. As noted in their victim impact statement (VIS), George Sager and Nancy Lesage write that Lewis called them "Mom and Dad" and said they would be well taken care of. (Sager/Lesage VIS). A family member to victim Shirley Rodgers observed that Lewis was able to pull the "long con" by acting as a friend and advisor for a ten-year period, stealing from the accounts during the entire time. (B. Rodgers VIS). Gloria Shea writes that she knew Lewis' family members and attended Lewis' birthday parties. (Shea VIS).

Lewis also falsely represented herself as a licensed securities broker to Sager/Lesage, Shea, Guerts, and others. (PSR ¶ 18, 20-22). Once she gained victim trust, Lewis often assumed complete control of victim finances. Many of the victims were not computer savvy-a circumstance that Lewis used to her advantage by having account statements sent directly to her. (PSR¶15, 42) (Shea VIS). Moreover, Lewis was clever enough not to represent she would obtain "pie in the sky" gains for the victims. As written by Sager/Lesage, the profits Lewis represented as achievable were enough to attract investor interest but not so excessive as to raise doubt.

3

(Sager/Lesage VIS).

Lewis acts were fraudulent on numerous fronts. Those victims that insisted on financial statements from Lewis were presented with false documents. (PSR ¶ 15 and Exh. 1-3). Her fraudulent acts also included telephone contact with the various financial institutions during which she represented herself as one of the victims in order to conduct account activity. (PSR ¶ 15). On approximately 100 occasions, Lewis forged the signature of Mary Jane Kennedy and others to obtain victim funds. (PSR ¶ 19).

Once complete and unfettered access to victim accounts occurred, Lewis created a fraudulent joint account that was used to send victim funds. (PSR¶ 12). This served to insulate Lewis, to some degree, and make the transactions from the victim's sole account to the joint account less suspicious. *Id.* Once in the joint account, Lewis would usually transfer funds to one or more of her individual accounts for her personal use and gain. *Id*.

Viewing some of Lewis' account activity from just one day over the course of six years of embezzling victim funds is instructive when determining the extent of her financial manipulation of victim accounts. On April 26, 2013, Lewis shuffled funds from one account to another as set forth below. Some of the transfers appear to make little sense as Lewis withdraws money from one account only then to deposit funds back into that same account. Some of the account activity from that day is as follows:

- $9,000 from Gloria Shea account to joint Lewis/Shea account
- $2,400 from Lewis account to joint Lewis/Shea account
- $2,000 from Lewis/Shea account to Lewis individual account
- $2,500 from Rodgers account to joint Lewis/Rodgers account
- $2,500 from Rodgers/Lewis account to Lewis individual account
- Variety of transfers/checks written by Lewis from her Chase checking account (Exh. 4)

As noted above, Lewis embezzled in excess of $2,000,000 from the victims. Many of them have asked how their money was spent. It appears the short answer is that it was spent

4

frivolously. A summary of activity from April 2012 for just one of Lewis' accounts is attached and sheds some light on her spending patterns. (Exh. 5). As detailed in Exh. 5, Lewis and her then boyfriend, Antonio Pressley, gambled away some of the victim funds.[1] A significant amount purchases were made at Home Depot and Menards -presumably to improve Lewis' rental properties. Other expenditures included approximately $9,500 at American Antique and Jewelry Store. Per Exh. 5, over this relatively brief time period, Lewis transferred approximately $70,000 into that account and spent in excess of $66,000. Very simply, Lewis embezzled victim money to support her daily living expenses and those of boyfriends, like Antonio Pressely, and family members.

Beyond the unfathomable dollar amount taken, what aggravates the nature and circumstances of this case is that Lewis intimately knew the financial condition of most, if not every victim. She had to have known that depleting their funds would cause the very massive life style altering circumstances it now has. These are not extremely wealthy victims. As noted below, they are hard-working, cautious spenders and savers that worked long hours their entire life.

The victim impact statements detail how Lewis' embezzlement impacted their lives. First, the damage to victims by Lewis' actions is immeasurable in dollars. It has left many victims destitute and, given their age, results in an inability for some to return to the work force in order to meet their financial needs. George Sager writes that at 91 years of age he is in financial ruin and has sought public assistance for food and housing. (Sager VIS). Robert Guerts reports that because of Lewis embezzling his funds, he cannot retire and needs to continue to

---

[1] Menominee and Oneida Casino records show that between 2010 and 2013, Lewis spent almost $180,000 using a player's card. The casinos do not track an individual's gambling without use of the card. Of this total, Antonio Pressley accounted for approximately $39,100 of the total.

5

work. (PSR ¶ 54). As stated by Barry Rodgers, "My parents have no pension. They are now living on social security alone, no more dinners out, nothing to show for a lifetime of work, no security for the future." (B. Rodgers VIS). Beth Rodgers reports that her mother, Shirley Rodgers, plan to stay in their home for a longer period of time while having professional assistance has been thwarted. (B.A. Rodgers VIS). Further, Shirley Rodgers will likely have to sell their home in order to pay for the assistance they will need. (B.A. Rodgers VIS) Beth Rodgers advises that she is looking for a higher paying job, in large part, to support her parents. (B.A. Rodgers VIS).

The money Lewis stole was saved through a lifetime of hard work and sacrifice, generally by victims who worked long hours. Gloria Shea worked her entire adult life so that she could financially take care of herself. (Shea VIS) Mary Jane Kennedy describes her financial strategy as saving 50¢ from every dollar earned as a forty-year employee of Metropolitan Insurance. (PSR ¶ 82).

Beyond the theft of their life savings, Lewis' actions have wreaked havoc in other ways. Sager/Lesage report being constantly hounded by creditors looking to collect on the numerous credit card charges run up by Lewis. (Sager/Lesage VIS). They write "The complexity of unraveling the mess to restore our credit is beyond our combined abilities." (Sager/Lesage VIS). Mary Jane Kennedy writes of a similar experience. (M. Kennedy VIS).

The tax consequences of Lewis' actions have been a nightmare for some of the victims. Many have had to meet with an IRS representative in an attempt to resolve past tax liabilities and explain current obligations stem from fraud on their accounts. Gloria Shea's tax situation was so complicated that Brown County Adult Protective Services assisted Ms. Shea in hiring an accountant to file her income tax returns. (PSR ¶ 61). Ultimately, Ms. Shea needed Brown

County financial assistance to pay her federal and state tax obligations for 2012. (PSR ¶ 61). Mary Jane Kennedy appears to be in the same situation with the IRS. (PSR¶ 79).

Lewis' fraud has also fractured or, at the very least, negatively impacted victim relationships with family members. Relatives of Mary Jane Kennedy recount a time period when they were at odds given their suspicions of Lewis' motives. (PSR ¶ 80). Similarly, Barry Rodgers reports questioning his mother (Shirley Rodgers) about her relationship with Lewis. (B.Rodgers VIS). Ms. Rodgers "got angry" due to Barry "disparaging Lewis." Rodgers writes "at that point, I realized that I was not in a position to match Lewis' sociopathic charm for gaining my mother's trust." (B.Rodgers VIS). Beth Rodgers reports that this incident has also caused family friction and stress over how to effectively respond to the depletion of her parent's assets. (Beth Rodgers VIS).

One bottom line victim response to Lewis' crimes is that it has forever altered their trust in others and undermined confidence in their own decision making. As Sager/Lesage reports "We don't know who to trust." (Sager/Lesage VIS). Shirley Rodgers reports she no longer trusts her own judgment. (PSR¶ 65). Marie Liebman reports that after the crimes were detected, she began to doubt herself and lacked confidence when making decisions. (PSR ¶ 51). Again, because of Lewis, these victims will never be the same.

Lewis has also robbed the victims of their dignity, self-worth, and health. Many can't believe they fell for the thievery. Sager/Lesage reports feeling "embarrassed, surprised and disappointed." (Sager/Lesage VIS). Both are simply overwhelmed and humbled by the need to seek public assistance. *Id*. Gloria Shea said her life has been destroyed and the crime never leaves her mind. (PSR ¶59). Her only source of income now is Social Security. *Id*. Several report health complications. (PSR ¶ 60, 73, 81). Justice requires a sentence equal to the pain suffered by

the victims whose lives are so severely impacted by Lewis' actions.

    b. *History and characteristics of the defendant.*

        1. Background on Lewis.

Lewis has no valid excuse for her crime. Unlike many federal defendants, Lewis enjoyed an intact family as a child. She describes her childhood as "carefree." (PSR ¶ 122). Lewis does not have any significant drug or alcohol issue despite a father who was an alcoholic. She graduated from high school and obtained the necessary license to serve as an investment advisor and insurance agent. (PSR ¶ 148, 149). Lewis was employed in the investment industry for approximately 17 years earning $60,000 annually. (PSR¶154, 155).

        2. Lewis' relationship with Pressley.

Lewis claims that Anthony Pressley, a former boyfriend, is responsible for some of her troubles. She claims that Pressley threatened her and encouraged her to take victim money. PSR ¶ 127-128). Lewis most recent pro-se filings asserts that Pressley forced her to sign over titles and deeds, threatened her son's life, and turned over to the police documents from her computer. (Docket #20).

At the time of this filing, law enforcement has not been able to substantiate Lewis's claims. Pressley was interviewed by law enforcement on several occasions. He adamantly denied abusing Lewis. Pressley admits arguing with Lewis about various affairs they both had during the course of their relationship, but never did such arguments result in bloodshed. Pressley asserts that any domestic violence sustained by Lewis was committed by Michael Moore, a former boyfriend. Pressley claimed that Lewis dated Moore while he (Pressley) was living with her. During that time, she also paid Moore's personal expenses. Pressley further denied using Lewis' computer to access victim accounts or force Lewis to steal from victim accounts. Pressley

8

indicated that Lewis made a living as a "stockbroker" and would often use the computer from morning until late at night. Pressley said he only used her computer on a limited basis for such purposes as internet car searches.

Pressley's statements are corroborated by Michele Hildahl, a close associate of Lewis. Hildahl reports that sometime in 2013, Lewis showed her a bruise on her face and told her that "Mike" was responsible. Hildahl said Lewis told Pressley that she fell over a chair so that Pressley would not know that Lewis was also dating Mike. Hildahl indicated that Lewis is not a credible person.

A search of local law enforcement records revealed no reports of disorderly conduct or domestic abuse incidents between Lewis and Pressley. However, Green Bay Police Department records indicate that on January 10, 2011, Lewis reported that Michael Moore sent both text messages and voicemails to her that threatened both her safety and that of her son.

But even assuming Lewis' claims of abuse by Pressley are true, it provides no explanation for the years of thievery that predated their relationship. Lewis and Pressley began dating in October 2009. (PSR ¶ 126). By that time, Lewis had already embezzled approximately $500,000 from Mary Jane Kennedy having started systematically doing so by at least September 2006.

### 3. Termination from M&I Financial.

Lewis' history of fraudulent or unethical actions involving clients began shortly after her employment with M&I Financial that began on August 31. 2005. (PSR ¶ 153). Lewis was terminated a mere four months later on January 9, 2006. *Id*. One of the listed termination reason was "registered representative was detected check kiting by Affiliated Bank." Further investigation revealed a series of loans that Lewis had procured from customers in violation of

9

Rule 2370.[2] *Id.*

    4.    State of Wisconsin Department of Financial Institution investigation (DFI).

The circumstances surrounding Lewis contacts with DFI are appalling but entirely consistent with her character for deception. In approximately March 2009, a family member of Mary Jane Kennedy reported to DFI that she believed Lewis made several unauthorized withdrawals from Kennedy's account. The family member advised that Lewis produced receipts from Fidelity Investments but that a subsequent check revealed no such accounts existed. DFI investigators contacted Lewis (under former name Veeser) about the complaint in a letter dated May 4, 2010. (Exh. 6). Lewis responded via letter denying the "offer for sale or purchase of any securities of any kind for or to anybody" and suggested someone was out to get her. (Exh. 7).

Shortly thereafter, a letter was sent to Kathryn Denton, a DFI investigator, purportedly from Mary Jane Kennedy stating that "My niece Lisa does not offer or sell any securities to me. There are no written or signed agreements between us and I certainly have not loaned any money to her." (Exh. 8). Following receipt of that letter, a final form was submitted to DFI, again purportedly from Mary Jane Kennedy. It simply provided that "no transactions took place" and was purportedly signed by Mary Jane Kennedy. (Exh 9). Several months later the investigation was closed but with a reminder to Lewis not to invest on behalf of others. (Exh. 10).

In truth, the documents attributed to Mary Jane Kennedy appear to be a complete fraud. Kennedy reports she did not sign any of the documents and that Lewis drove her to Madison for the meeting with the DFI investigator during which Lewis did all the talking. (Exh 11). Per

---

[2] **2370. Borrowing From or Lending to Customers.**
(a) No person associated with a member in any registered capacity may borrow money from or lend money to any customer of [the member] such person unless: (1) the member has written procedures allowing the borrowing and lending of money between such registered persons and customers of the member; and (2) the lending or borrowing arrangement meets the listed conditions.

10

Colleen Leigh, Kennedy's niece, Lewis "hijacked" the entire DFI investigation. *Id*.

And to add insult to injury, during the very days and months of this DFI investigation, Lewis continued to rob Kennedy blind. At the start of the DFI investigation in 2010, Lewis had already embezzled close to $600,000 from Kennedy. While in the midst of the investigation and over the course of a mere few days in late May 2010, Lewis had the nerve to transfer in excess of $6,000 from a Kennedy account to a Lewis personal account where funds were then withdrawn by Lewis in the form of personal checks to herself in the amount of $1,500 and of $1,800. Moreover, Lewis used funds deposited her personal account from Kennedys account that were used at several Door County, WI, restaurants over the July 4th weekend and to pay cell phone bills exceeding $550. (Exh.12).

        5.    Need for Deterrence.

The government respectfully requests the Court to consider deterrence as a compelling sentencing factor in this case. "Because economic and fraud-based crimes are 'more rational, cool, and calculated than sudden crimes of passion or opportunity' these crimes are 'prime candidate[s] for general deterrence." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir 2006). Further, "as the legislative history of the adoption of § 3553 demonstrates, Congress viewed deterrence as 'particularly important in the area of white collar crime." *Id*. (other citations omitted).

These principles were reaffirmed in *United States v. Peppel*, 707 F.3d 627 (6th Cir. 2013). In *Peppel*, the court referenced the need to implement a meaningful custodial sentence in fraud cases, even when "it was undisputed at the time of sentencing that [a defendant's] past history was exemplary." *Id*. at 638. And the Seventh Circuit has explained that in general, "[t]he system of penalties under the Guidelines is constructed on the belief that higher fines, and longer

11

sentences of imprisonment, are more effective deterrents. A large body of evidence supports this intuition." *United States v. Turner*, 998 F.2d 534, 536 (7th Cir. 1993).

## Conclusion

For the foregoing reasons, the government respectfully requests the Court sentence Lewis to a ten-year term of imprisonment with a maximum period of supervised release. As stated in the plea agreement, Lewis agrees to the forfeiture of various properties and the entry of a money judgment in the amount of restitution owed.

Dated at Green Bay, Wisconsin, this 6th day of June, 2014.

        Respectfully submitted,

        JAMES L. SANTELLE
        United States Attorney

By:   s/William J. Roach
       WILLIAM J. ROACH
       Assistant United States Attorney
       WI Bar Number 1018756
       Attorney for Plaintiff
       Office of the United States Attorney
       Eastern District of Wisconsin
       205 Doty Street, Suite 301
       Green Bay, Wisconsin 54301
       Telephone: (920) 884-1066
       Fax: (920) 884-2997
       E-Mail: WILLIAM.J.ROACH@usdoj.gov